E-FILED; Baltimore City Circuit Court
Docket: 10/19/2026 11:36 AM; Submission: 10/19/2026 11:36 AM
Envelope: 28752274

**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>Plaintiff,<br><br>v.<br><br>YARDI SYSTEMS, LLC; RENTCAFE, LLC; PENNROSE MANAGEMENT COMPANY, LLC,<br><br>Defendants. | JURY TRIAL DEMANDED<br><br>C-24-CV-26-006965 |

**COMPLAINT**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

PARTIES ..... 3

JURISDICTION AND VENUE ..... 4

FACTUAL ALLEGATIONS ..... 4

I. Property managers in Baltimore, including Pennrose, are increasingly using RentCafe to collect rent and additional fees from economically vulnerable tenants ..... 4

II. Tenants who pay rent via RentCafe are saddled with surprise junk fees ..... 7

III. RentCafe steers tenants toward using payment options that generate service fees ..... 10

IV. The RentCafe Defendants and Pennrose jointly control Pennrose's RentCafe portals ..... 13

V. Defendants' actions have repeatedly contravened state and federal efforts to combat "junk fees" and "dark patterns" that are recognized to harm consumers ..... 14

VI. Defendants engage in a variety of unfair, deceptive, and/or abusive acts and practices ..... 16

COUNT 1: Failing to Disclose Full Fee Schedule and Fee-Free Payment Options ..... 18

COUNT 2: Collecting Fees Not Provided for in Lease Agreements ..... 19

COUNT 3: Collecting Debit Card Fees Prohibited by Payment Processors ..... 22

COUNT 4: Collecting Rental Debts Without a License ..... 23

COUNT 5: Failing to Disclose Service Fees ..... 25

PRAYER FOR RELIEF ..... 26

DEMAND FOR JURY TRIAL ..... 27

## INTRODUCTION

1. Nobody likes to be caught off guard. In recent years, consumers have increasingly been surprised by "service fees," "administrative fees," "processing fees," and similar junk fees that are driving up their bills. Such fees are especially unwelcome when they are tacked on to essential goods and services, such that consumers have little choice but to cough up the additional money in order to obtain housing, transportation, or groceries.

2. These junk fees are not only annoying; they are also illegal. The Federal Trade Commission has warned companies against charging such fees and taken action against companies that did not heed that warning. The Maryland Attorney General, too, has prosecuted companies who lure consumers in with falsely deflated prices, only to later bury them in additional fees.

3. At the same time, the use of property technology platforms, or "proptech," has proliferated in the rental industry. Proptech platforms promise to optimize the business of housing by automating the processing of rental applications, the screening of prospective tenants, the collection of rental payments, and the like.

4. RentCafe is one such proptech platform. It is the fourth-largest property management tool in the country by market share and controls 8.04% of the property-management market.[1] More than 14,000 property managers and landlords nationwide use RentCafe.[2]

5. While RentCafe markets itself to property managers as a way to simplify administrative tasks, such as collecting rent payments, the outlook for tenants is bleaker. Most

---

[1] Yardi RENTCafe Market Share, 6 Sense, https://6sense.com/tech/property-management/yardi-rentcafe-market-share (last visited Oct. 6, 2026).

[2] *Id.*

tenants who pay rent via RentCafe are charged not only the rent that they agreed to in their lease, but also RentCafe's "service fees."

6. The term "service fees" is a misnomer. Tenants do not receive any additional "service" for the payment of those fees. Rather, these are additional fees that tenants are required to pay for the privilege of paying rent—otherwise known as "pay-to-pay" fees—that drive revenue for RentCafe.

7. Month after month, these fees add up. And they are especially harmful to seniors, people on fixed incomes, and people who live in affordable housing. Yet these are precisely the types of tenants who are being made to pay rent via RentCafe.

8. Last year, four of ten households renting in Baltimore spent 35% or more of their income on rent and utilities.[3] And of Baltimoreans making $35,000 or less a year, more than half spent 50% or more of their income on rent and utilities.[4] A few dollars paid in fees to RentCafe is a few dollars less for groceries, transportation, or medical bills.

9. Surprising tenants with "service fees" gives rise to a number of unfair, abusive, and/or deceptive trade practices in violation of Baltimore's Consumer Protection Ordinance.

10. This case is about how RentCafe and Baltimore's property managers use such predatory practices to squeeze every last dollar out of economically vulnerable renters. The

---

[3] Sahana Jayaraman and Jasmine Vaughn-Hall, *Rent is guzzling Baltimore paychecks. The poorest feel it the most*, The Baltimore Banner (Sep. 11, 2025), https://www.thebanner.com/community/housing/baltimore-rent-housing-costs-census-IAPXOCULORGDLMAMULBE3PYLIU/ [https://perma.cc/YV6D-H4SQ ] (last visited Aug. 31, 2026).

[4] According to U.S. Department of Housing and Urban Development (HUD) guidelines, households that spend more than 30% of their income on housing costs are cost burdened. Households that spend more than 50% are severely cost burdened.

Mayor and City Council of Baltimore bring this action to stop Defendants' unfair, abusive, and deceptive practices and hold them meaningfully accountable.

## PARTIES

11. Plaintiff **Mayor and City Council of Baltimore** ("the City" or "Baltimore") is a municipal corporation organized and existing under the laws of Maryland. Plaintiff is authorized, through the City Solicitor of the Baltimore City Law Department, to enforce laws for the protection of the public.

12. Defendant **Yardi Systems, LLC** is a Delaware limited liability company headquartered in Santa Barbara, California. Yardi provides software, including property management software, to the real estate industry. In addition to RentCafe, which is the fourth-largest property management tool in the country, Yardi also owns and operates the first and third largest tools.[5] Across these three products, Yardi has nearly 50,000 customers.

13. Defendant **RentCafe, LLC** is a Delaware limited liability company headquartered in Santa Barbara, California. RentCafe, LLC is a wholly owned subsidiary of Yardi Systems, LLC. Yardi develops and licenses its RentCafe software through RentCafe, LLC. RentCafe, LLC and Yardi, LLC are collectively referred to as the "RentCafe Defendants."

14. Defendant **Pennrose Management Company, LLC** is a Pennsylvania limited liability company headquartered in Philadelphia, Pennsylvania. Pennrose owns and/or manages hundreds of rental units in Baltimore City. Pennrose has contracted with the RentCafe Defendants to collect rent at all of its Baltimore properties via the RentCafe platform.

---

[5] Yardi Genesis Market Share, 6 Sense, https://6sense.com/tech/property-management/yardi-genesis-market-share (last visited Oct. 6, 2026); Yardi Voyager Market Share, 6 Sense, https://6sense.com/tech/property-management/yardi-voyager-market-share (last visited Oct. 6, 2026).

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction because the claims at issue arise under a City of Baltimore ordinance. Md. Code Ann., Cts. & Jud. Proc. § 1-501. The amount-in-controversy exceeds the threshold for this Court to exercise jurisdiction. *Id.* §§ 1-501; 4-402(d)(1)(i).

16. This Court has personal jurisdiction. All Defendants transact business or perform work or service in Baltimore, contract to supply services in Baltimore, and cause tortious injury by an act or omission in Baltimore, and Plaintiff's causes of action arise from this conduct. *Id.* § 6-103.

17. Venue is proper in this Court. Defendants reside, carry on regular business, or are employed by businesses in Baltimore. *Id.* § 6-201(a). Further, the causes of action arose in Baltimore. *Id.* § 6-201(b).

## FACTUAL ALLEGATIONS

### I. Property managers in Baltimore, including Pennrose, are increasingly using RentCafe to collect rent and additional fees from economically vulnerable tenants

18. Pennrose operates nine multi-family housing developments in Baltimore City. Every Pennrose property in Baltimore participates in the Low-Income Housing Tax Credit Program, meaning that some or all of its units are targeted at low-income tenants.

19. Pennrose markets its apartment complexes and townhome developments as Tax Credit Program Communities, targeting seniors, people with disabilities, students, people with low or fixed incomes, and other populations who need affordable housing.

20. Three of Pennrose's properties—Cherry Hill, Oaks at Liberty, and Wyman House—are specifically for seniors and, in Wyman House's case, people with disabilities.

Pennrose specifically advertises these properties' proximity to medical centers, building common areas, and access to public transportation to entice such tenants.

21. Rents at Pennrose properties start at $869 for a one-bedroom apartment, $880 for two bedrooms, $1,224 for three bedrooms, and $1,654 for four bedrooms. These rents are all affordable to extremely low or very low-income households under City guidelines.

22. For years, tenants at Pennrose buildings in Baltimore were able to pay rent by dropping off a certified check or money order with the property management office. For Pennrose's tenants, many of whom lack access to credit or a bank account, this was a straightforward and convenient way to pay rent.

23. In approximately 2024, however, Pennrose switched to processing rent payments via RentCafe. RentCafe is a technology suite used by property managers and landlords throughout the country. Among its products is the RentCafe Resident Portal, which property managers can use to collect rent, handle maintenance requests, and otherwise automate the relationship between property manager and tenant.

24. Each Pennrose property has its own RentCafe Resident Portal.[6] The Portal is branded with the property's information, designed and hosted by the RentCafe Defendants, and co-managed by Pennrose and the RentCafe Defendants.

---

[6] Wyman House: https://wyman-house-rentcafewebsite.securecafenet.com/residentservices/wyman-house/userlogin;
Cherry Hill: https://cherry-hill-senior-rentcafewebsite.securecafenet.com/residentservices/cherry-hill-senior/userlogin;
Oaks at Liberty: https://oaks-at-liberty-rentcafewebsite.securecafenet.com/residentservices/oaks-at-liberty/userlogin;
Orchard Ridge: https://orchardridgebalt.securecafenet.com/residentservices/orchard-ridge-2/userlogin;
Renaissance at Reservoir Hill: https://renaissance-at-reservoir-hill-rentcafewebsite.securecafenet.com/residentservices/renaissance-at-reservoir-hill/userlogin;
Chapel Green: https://chapel-green-rentcafewebsite.securecafenet.com/residentservices/chapel-

25. Through each Resident Portal, the RentCafe Defendants collect payments from tenants, deduct their own fees, and pass the remainder on to Pennrose.

26. Pennrose has presented the switch to RentCafe as mandatory. For example, at a December 15, 2025, community meeting at Wyman House—a Pennrose-managed apartment complex for seniors and people with disabilities—tenants who had been paying their rent by certified check or money order for years were told that RentCafe would be mandatory for all future rent payments. Pennrose employees were on hand to help residents set up RentCafe accounts.

27. A drop box that had been in the lobby for years, in which residents used to deposit their money orders and checks, was ripped out of the wall.

28. When Pennrose staff set up RentCafe accounts for residents who did not understand how to use the technology, they also activated RentCafe's "autopay" feature. Tenants who have never logged into their own RentCafe accounts—indeed, they do not know how—are charged by the system each month.

29. The use of RentCafe to pay rent, billed as a way to make life easier for tenants, has actually made it harder. Pennrose tenants have reported that payments they have made are not properly accounted for in the Portal, such that the "Amount Due" reflected in the Portal is

---

green/userlogin;
Renaissance Row: https://renaissance-row-rentcafewebsite.securecafenet.com/residentservices/renaissance-row/userlogin;
The Chateau & The Riviera: https://chateau1-rentcafewebsite.securecafenet.com/residentservices/chateau1/userlogin, https://riviera-revitalization-rentcafewebsite.securecafenet.com/residentservices/riviera-revitalization/userlogin;
Uplands: https://uplands-estates-rentcafewebsite.securecafe.com/residentservices/uplands-estates/userlogin.aspx

incorrect. The Portal states that tenants owe rent that they have already paid. This error can result in late fee notices or, in more extreme cases, notices of eviction.

30. As explained further below, in order to make rent payments via RentCafe's Resident Portal, most tenants are required to pay a service fee on top of their rent. The amount of the service fee depends on what payment method the resident uses.

31. Pennrose's leases do not state that residents of its properties will be required to pay rent via RentCafe or that additional fees will apply to do so. Tenants who have lived at its buildings for years, and signed their leases prior to Pennrose's adoption of RentCafe, have not been given updated leases stating that they will be required to use RentCafe or to pay its fees.

32. Pennrose is one of many Baltimore property managers that has adopted RentCafe in recent years. Hundreds of rental properties in Baltimore use RentCafe to process rent payments,[7] including nearly 50 income-restricted properties and buildings with affordable units.[8]

## II. Tenants who pay rent via RentCafe are saddled with surprise junk fees

33. In addition to customizing the look and feel of their Resident Portal, each property manager can choose, among the payment options offered by RentCafe, which payment methods to accept. Options include credit card, debit card, cash (via RentCafe's Walk-In Payment System), and Automated Clearing House (ACH). The RentCafe Defendants customize each property's Resident Portal to accept only the payment methods which the property manager has chosen.

---

[7] *Apartments for Rent in Baltimore City, MD*, RENTCafe, https://www.rentcafe.com/apartments-for-rent/baltimore-city-md/ (last visited Aug. 31, 2026).

[8] *Affordable Apartments for Rent in Baltimore City, MD*, RENTCafe, https://www.rentcafe.com/apartments-for-rent/baltimore-city-md/?PropertyType=Affordable (last visited Aug. 31, 2026).

34. Three of the four payment options offered by RentCafe require tenants to pay a non-refundable service fee, on top of their rent, for the privilege of submitting a payment via the RentCafe Resident Portal. That fee is set and collected by the RentCafe Defendants, who keep a cut for themselves and pass the remainder of the payment to the property manager.

35. Tenants may pay via credit card. Credit card payments are subject to a 2.5%–3.5% fee per payment.[9] As such, a tenant who pays a monthly rent of $1,000 by credit card must pay an additional $25 to $35 per month—$300 to $420 per year—in fees to RentCafe. This is roughly the cost of a week's groceries for a two-person household.

36. Tenants may also pay via debit card. Debit card payments are subject to a flat fee, between $3.95 and $9.95 per payment, depending on the amount of their rent. As such, tenants who pay via debit card pay between $47.40 and $119.40 per year in fees to RentCafe. The low end of that range, $47.40, is roughly the cost of two monthly bus passes for a senior citizen in Baltimore. The high end of that range is roughly the cost of five monthly senior bus passes.

37. Tenants who wish to pay by cash must use RentCafe's Walk-In Payment System (WIPS), for which they are charged a $3.99 service fee per transaction. The WIPS requires tenants to obtain a barcode from their property manager each month, which they then take to a participating retail location, such as Walmart or 7-Eleven, for a cashier to scan the barcode and accept the cash. Making rental payments by cash for a full year costs $47.88. This is roughly the cost of a month's water and trash bill for a Baltimore resident living in an apartment building.

38. RentCafe does have an Automatic Clearing House (ACH) payment option, which does not charge a service fee. But that option is not available to all tenants.

---

[9] Rent Payment Options, RENTCafe,
https://cdngeneralcf.rentcafe.com/dmslivecafe/3/1773211/3_1773211_24980520.pdf.

39. First, each property manager can choose which payment methods to accept and whether to accept ACH payments through their individual RentCafe Resident Portal. If a property manager chooses not to accept ACH payments, their tenants must use one of the other three options and incur fees.

40. Second, making an ACH payment requires a bank account; unbanked individuals cannot make ACH payments. Low-income tenants in Baltimore are especially likely not to have bank accounts. In 2023, about 25% of all households in the Baltimore area were underbanked or unbanked.[10] As such, unbanked tenants, who are disproportionately low-income tenants, cannot avail themselves of the ACH option and must pay RentCafe's service fees.

41. Third, setting up an ACH payment requires a tenant to give RentCafe, and thus their property manager, direct access to their bank account. Tenants may not want to give RentCafe or their property manager such access for any number of reasons—for example, because the Portal does not accurately reflect the payments they have made or the Amount Due, as outlined above. Or, tenants on a fixed income, as many Pennrose tenants are, may want to remain in control of when their account is debited by RentCafe, depending on when they expect to get paid or which bills are coming due first. If a tenant wants to retain the privacy and control of their personal bank account, ACH is not an option.

42. Finally, tenants who do not have the technological literacy to set up an ACH payment—which typically requires liaising between the platform and one's bank in order to

[10] FED DEPOSIT INS. CORP., 2023 FDIC NATIONAL SURVEY OF UNBANKED AND UNDERBANKED HOUSEHOLDS, APPENDIX TABLES 55 (2024), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-appendix-tables.

validate the account—cannot avail themselves of the ACH option. Seniors and people with disabilities are especially likely to be in this situation.

43. If any of the four prior conditions are true, the tenant must use a non-ACH payment method and incur the attendant service fee.

**III. RentCafe steers tenants toward using payment options that generate service fees**

44. The RentCafe Resident Portal makes it difficult for tenants to understand what it will actually cost them to pay rent via the payment methods on offer, thereby steering them to the methods that generate fees for the RentCafe Defendants.

45. Tenants who log onto the RentCafe Resident Portal to make a rent payment are presented with whatever options their property manager has selected—in Pennrose's case, credit card, debit card, or ACH.[11] Prior to selecting a payment method, tenants are told in general terms that using some payment methods may come with a service fee, but not which methods will incur fees (and perhaps more importantly, which methods will not) or what the fee for each method is.

46. If the tenant selects the credit or debit payment method, they are then told that "[a] service fee will be charged." But again, the portal does not state what the fee actually is or that the tenant can avoid the fee by restarting the payment flow and paying via ACH instead.

47. It is only on the final page of the payment flow, just before clicking submit on a credit or debit card payment, that the tenant is informed of what the service fee will actually be. And they are never told that there is a way to avoid the fee by paying via ACH.

---

[11] As described below, the Portal does not show the WIPS cash payment option even where the property manager accepts it.

48. Neither do RentCafe Resident portals have a page anywhere on the website listing these service fees comprehensively. Instead, the portals have separate "Frequently Asked Question" pages for each payment method. In order to get to each FAQ page, consumers must exit the payment flow, navigate to the FAQ page for their chosen payment method, and expand a dropdown to find the service fees hidden in the fine print.

49. There are separate FAQ pages and separate dropdowns for each payment method. In order to compare the fee for each payment method, a tenant would need to navigate to the FAQ page for credit card payments, expand a dropdown, read the fine print, note the listed fee; navigate to the FAQ page for debit card payments, expand a dropdown, read the fine print, note the listed fee; navigate to the FAQ page for ACH payments, expand a dropdown, read the fine print, note the listed fee; compare their notes; and finally restart the payment flow and select their payment method of choice.

50. Neither can tenants know the fees associated with each payment method by reading their leases, because Pennrose leases do not even disclose that tenants will be required to pay rent via RentCafe, let alone what the payment method options are, that there are fees associated with most payment methods, or what the amounts of those fees are.

51. Where property managers accept cash payments via RentCafe's WIPS systems, the Portal does not show the WIPS option. Tenants must find out about the WIPS option through some other means.

52. Pennrose accepts WIPS payments, but its tenants were not affirmatively offered the option. Rather, tenants who did not want to pay rent online via RentCafe approached the property manager with this concern and were eventually told that they could use WIPS—but that they still had to make a RentCafe account and that a processing fee would still apply. This is

because WIPS payments (unlike the certified check and money order options, which are no longer available) are still processed via RentCafe and subject to its fees.

53. Tenants who pay via cash are required to pay two fees: a fee to obtain the certified check or money order, to the retailer from which they obtain one, and the WIPS processing fee, to the RentCafe Defendants. This is not laid out anywhere in writing; tenants who pay via WIPS, as many seniors who have long paid their rent via certified check or money order prefer to do, must learn by doing.

54. The fact that it is so difficult to excavate RentCafe's full fee schedule is no mistake. RentCafe has every incentive not to disclose this information, because ACH payments do not generate any revenue for RentCafe.

55. On the other hand, on information and belief, the "service fees" for accepting credit and debit card payments exceed the actual expenses incurred by the RentCafe Defendants for processing these payments.

56. Visa and MasterCard, which collectively issue almost all debit cards in the United States,[12] both prohibit merchants from charging surcharges for debit card transactions. As such, the fees that the RentCafe Defendants charge for accepting debit card payments cannot possibly be passed through to the card processors, because the processors prohibit the RentCafe Defendants from charging such fees in the first instance.

57. As such, while tenants are led to believe that the "service fees" are simply covering the costs charged by card processors to the RentCafe Defendants, they are in reality revenue-generating fees for the RentCafe Defendants. By not conspicuously disclosing the fee

---

[12] *See* Debit Card & Prepaid Card Statistics, WalletHub (June 17, 2025), https://wallethub.com/edu/ca/market-size/25538.

amounts or informing tenants of fee-free payment options, RentCafe steers tenants toward revenue-generating payment methods.

**IV. The RentCafe Defendants and Pennrose jointly control Pennrose's RentCafe portals**

58. The RentCafe Defendants host a RentCafe Resident Portal for each Pennrose property on their "securecafe" domain.

59. The Resident portals are designed and maintained by the RentCafe Defendants.

60. Defendant Yardi's Terms and Conditions govern the use of all Resident portals.

61. The RentCafe Defendants have the power to make stylistic and substantive changes across all Resident portals.

62. Resident portals can be accessed via a website or mobile applications, which are also designed, maintained, and controlled by the RentCafe Defendants.

63. Pennrose has customized its RentCafe Resident portals with its company logo. Pennrose also has the ability to make other customizations, for example, selecting what payment methods it will accept.

64. Pennrose and the RentCafe Defendants jointly maintain and control its Resident portals. That is reflected in the joint branding of the portals[13]:

[13] Wyman House Resident Services Page, Pennrose Management, https://wyman-house-rentcafewebsite.securecafenet.com/residentservices/wyman-house/userlogin (last visited Aug. 31, 2026).




**V. Defendants' actions have repeatedly contravened state and federal efforts to combat "junk fees" and "dark patterns" that are recognized to harm consumers**

65. RentCafe's service fees contravene significant regulatory efforts to combat hidden mandatory fees associated with paying rent, sometimes called "rental junk fees."

66. In late 2025, the Federal Trade Commission (FTC) sent letters to 13 property management software companies, including Defendant Yardi, warning them that preventing tenants from accessing accurate information regarding fees may violate the FTC Act. While the letters were specifically about the companies' failure to disclose the total rental price, including any fees, in apartment listings, its admonition that "property management software programs may cause consumer harm . . . when they do not accurately display complete pricing information across websites hosted on their platforms"[14] is equally true as applied to RentCafe's failure to disclose its full fee schedule or disclose the existence of fee-free payment options.

[14] Press Release, Fed. Trade Comm'n, FTC Sends Warning Letters to 13 Property Management Software Providers Nationwide (Dec. 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/12/ftc-sends-warning-letters-13-property-management-software-providers-nationwide [https://perma.cc/F9AJ-3HFG].

67. The FTC has also secured monetary relief from two other property management companies that have similarly hidden rental junk fees in fine print. In December 2025, the agency settled a case against Greystar, a large property management company, for failing to disclose mandatory fees when marketing its units. Greystar was required to pay $24 million and clearly and conspicuously disclose all mandatory fees to prospective tenants.[15]

68. The FTC settled similar claims against Invitation Homes, another property management company, in September 2024 for $48 million.[16]

69. In March, the FTC announced that it is seeking public comment on proposed rulemaking to address junk fees in rental housing. In announcing this proposed rulemaking, the agency recognized that "[t]he failure to advertise the true total rent limits consumers' ability to make informed financial decisions, increasing their search costs and exposing them to other negative monetary consequences when they take on more rent than they can afford."[17]

70. Defendants' obfuscation of their service fees until the moment a tenant is pressing "pay" on RentCafe subverts these efforts toward transparency.

[15] Press Release, Fed. Trade Comm'n, Greystar Agrees to Pay $24 Million and Stop Deceptive Advertising Practices as a Result of FTC and Colorado Lawsuit Alleging the Firm Deceived Consumers About Rent Prices (Dec. 2, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/12/greystar-agrees-pay-24-million-stop-deceptive-advertising-practices-result-ftc-colorado-lawsuit [https://perma.cc/M7QJ-YHGK].

[16] Press Release, Fed. Trade Comm'n, FTC Takes Action Against Invitation Homes for Deceiving Renters, Charging Junk Fees, Withholding Security Deposits, and Employing Unfair Eviction Practices (Sept. 24, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-takes-action-against-invitation-homes-deceiving-renters-charging-junk-fees-withholding-security [https://perma.cc/YQZ5-EFBV].

[17] Press Release, Fed. Trade Comm'n, FTC Seeks Public Comment on a Proposed Rulemaking Regarding Unfair or Deceptive Rental Housing Fee Practices (Mar. 12, 2026), https://www.ftc.gov/news-events/news/press-releases/2026/03/ftc-seeks-public-comment-proposed-rulemaking-regarding-unfair-or-deceptive-rental-housing-fee [https://perma.cc/5VAH-G57J].

71. Regulators have also warned against the use of "dark patterns," user interfaces designed to trick or manipulate consumers. In 2022, the FTC released a report showing how companies use design practices called "dark patterns" to trick consumers into accepting hidden fees.[18] These "dark patterns" include concealing junk fees by advertising only part of a product's total price to lure consumers in, without mentioning other mandatory charges until late in the transaction, otherwise known as "drip pricing." By failing to mention service fees in a tenant's lease, failing to disclose a full fee schedule anywhere on the RentCafe Resident portals, and burying the true cost of rent until a tenant is on the verge of making a payment, Defendants employ such drip pricing to manipulate consumers.

## VI. Defendants engage in a variety of unfair, deceptive, and/or abusive acts and practices

72. The conduct by Defendants described above is rife with unfair, deceptive, and/or abusive acts and practices.

73. The Baltimore Consumer Protection Ordinance, Baltimore City Code art. 2 § 4 ("CPO"), provides that, "[i]n Baltimore City, a person may not engage in any unfair, abusive, or deceptive trade practice" in, *inter alia*, the sale or offer for sale of any consumer good or service, *id.* § 4-2.

74. Defendants are persons or merchants engaged in the sale and offer for sale of consumer goods and services. *Id.* §§ 4-1(9)-(10), 4-2(1)-(2).

75. Defendants' practices occur in Baltimore City. Penrose operates rental units in Baltimore City and uses RentCafe to collect rent for those units. The RentCafe Defendants

---

[18] Press Release, Fed. Trade Comm'n, FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers (Sep. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers [https://perma.cc/FUS9-A6CT].

contract with Pennrose to collect rent payments and fees in Baltimore City from Baltimore City residents.

76. "Unfair, abusive, or deceptive trade practice" in the CPO is defined consistently with the Maryland Consumer Protection Act, Md. Code Com. Law § 13-301 *et seq.* ("MCPA"). The MCPA, in turn, defines such practices to include failing to state a material fact if the failure deceives or tends to deceive (§ 13-301(3)) and violating the Maryland Consumer Debt Collection Act (§ 13-301(14)(iii)).

77. The MCPA also instructs that, "in construing the term 'unfair or deceptive practices,' due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." Md. Code Com. Law § 13-105. Under the FTC Act, a practice is unfair if it is likely to cause substantial injury that is not reasonably avoidable by the consumer and is not outweighed by benefits to competition or consumers, and a practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead a consumer acting reasonably under the circumstances.

78. An act or practice is abusive if it: (1) materially interferes with the ability of a consumer to understand a term or condition of a product or service; or (2) takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

79. Defendants have engaged in multiple unfair, deceptive, and/or abusive trade practices. Each unfair, deceptive, or abusive trade practice by Defendants is a separate violation of the CPO.

80. As outlined further below, and without limitation, Defendants have violated the CPO by (1) failing to disclose a full fee schedule before tenants select a payment method or that tenants may avoid fees by selecting the ACH payment method (All Defendants), (2) collecting amounts above what is provided for in consumers' leases (RentCafe Defendants), (3) collecting "service fees" for processing debit card payments, where such debit card surcharges are prohibited by payment processors (RentCafe Defendants), (4) collecting rental debts without a debt collection license (RentCafe Defendants), and (5) failing to disclose in consumers' leases that they will not be able to pay rent without paying additional service fees (Pennrose).

**COUNT 1**
**VIOLATION OF BALTIMORE CITY CODE ARTICLE 2 § 4-2 PROHIBITING UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES**
**Failing to Disclose Full Fee Schedule and Fee-Free Payment Options**
***All Defendants***

81. The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

82. The RentCafe Resident portals, which the RentCafe Defendants design and maintain, and Pennrose customizes, steer tenants toward fee-generating payment options by obfuscating the fees associated with each payment method behind multiple clicks, embedding fee information across several web pages in fine print, and failing to disclose the fee associated with a selected payment method until the last step of the payment flow.

83. By failing to disclose the full service fee schedule, or inform tenants of a fee-free payment option, Defendants deprive tenants of information that would allow them to understand how the payment method they choose affects the fees that they will have to pay. This lack of transparency is likely to cause substantial injury to consumers, who will have to choose a payment method without complete information and have no reason to even know that they are

being given incomplete information such that they could be reasonably expected to seek it out. Generic "transaction fees may apply" disclosures are not enough to put consumers on notice. And this lack of transparency benefits neither consumers nor competition.

84. Failing to disclose a full fee schedule or that fee-free payment options exist also interferes with consumers' ability to understand a significant term of their use of the RentCafe platform and takes unreasonable advantage of an information imbalance between Defendants and consumers. It is thus an abusive trade practice.

85. Each time Defendants collect a payment including a service fee without first disclosing their full fee schedule or that fee-free payment methods are available is a separate violation of the CPO. Each day upon which a violation continues is a separate offense.

**COUNT 2**
**VIOLATION OF BALTIMORE CITY CODE ARTICLE 2 § 4-2 PROHIBITING UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES**
**Collecting Fees Not Provided for in Lease Agreements**
***RentCafe Defendants***

86. The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

87. The Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201 *et seq.* (MCDCA), defines a collector as any "person collecting or attempting to collect an alleged debt arising out of a consumer transaction." *Id.* § 14-201(b). A person may be an individual, corporation, or any other legal or commercial entity. *Id.* § 14-201(d). And a consumer transaction is "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." *Id.* § 14-201(c).

88. A violation of the MCDCA is a *per se* unfair, abusive, or deceptive trade practice under the MCPA, *id.* § 13-301(14)(iii), and thus a violation of the CPO.

89. The RentCafe Defendants are corporations. And they collect rent paid by consumers for housing (*i.e.*, real property) and/or property management services on behalf of landlords and property managers.

90. The MCDCA makes it illegal to "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." *Id.* § 14-202(8).

91. Collecting service fees not provided for in the lease is a *per se* violation of the CPO. In collecting and seeking to collect service fees without knowing whether those fees are provided for in tenants' leases, the RentCafe Defendants enforce a right that does not exist.

92. The MCDCA also makes it illegal to "engage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act [FDCPA]." *Id.* § 14-202(11). Section 808 of the FDCPA, in turn, makes it illegal to use "unfair or unconscionable means to collect or attempt to collect any debt," including by collecting an amount that was not expressly "authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

93. In collecting and seeking to collect service fees that are not expressly authorized by the underlying lease agreement creating the rental debt or permitted by any other law, the RentCafe Defendants engage in conduct that violates the FDCPA and thus the MCDCA.

94. By violating these provisions of the MCDCA, the RentCafe Defendants *per se* employ unfair, abusive, or deceptive practices in violation of the CPO.

95. The RentCafe Defendants have actual knowledge that, by charging service fees not provided for in underlying lease agreements, they are violating the MCDCA. In 2022, a class of tenants sued Yardi and its subsidiary YES Energy in Maryland, alleging that they collected illegal service fees from tenants who paid their rent and utilities online. The plaintiffs prevailed at the motion to dismiss stage, with the Court holding that they had plausibly alleged that the

MCDCA prohibited Yardi and YES from charging fees not provided for in the original leases.[19] The utilities-based claims settled for $2.8 million to an estimated 72,000 class members in 2024.[20]

96. Charging service fees not provided for in the lease is not only a *per se* violation of the CPO; it is also an unfair trade practice, because it causes actual financial injury (in the form of paying service fees) to consumers who cannot reasonably avoid this fee—because they do not know when they sign their leases that they will have to pay via RentCafe or that such fees will be tacked on. Charging such fees without adequate notice provides no benefit to competition or consumers.

97. Charging service fees not provided for in the lease is also deceptive. The RentCafe Defendants misrepresent to tenants that they are required to pay its service fees when, in reality, these fees are prohibited by the FDCPA and MCDCA. This misrepresentation misleads reasonable consumers, who have no reason to question whether the fees being charged by the RentCafe Defendants are legal and often have no choice in the moment but to pay those fees, or risk falling behind on rent.

98. Charging service fees not provided for in the lease is also abusive, as it takes unreasonable advantage of a tenant's inability to protect their own interests in selecting a product and exercising their own rights. Where tenants do not know when they are signing the lease that the amount of rent in the lease is falsely deflated, because they do not know that they will have to pay RentCafe's service fees for the privilege of paying rent, they are unable to protect their own

---

[19] *Sullivan v. YES Energy Mgmt., Inc.*, No. 22-0418, 2022 WL 4777791, at *5 (D. Md. Sept. 30, 2022).

[20] Settlement Agreement and Release of all Claims, *Sullivan v. YES Energy Mgmt., Inc.*, No. 22-04185 (D. Md. Sept. 30, 2022).

interests by, for example, choosing to rent from a landlord who will not charge such fees. And when it comes time to pay rent, tenants have to pay the additional, illegal fees or risk losing their place to live, as a result of the power imbalance between tenants and their landlords.

99. Each time the RentCafe Defendants collect or attempt to collect a fee that is not provided for in that consumer's lease is a separate violation of the CPO. Each day upon which a violation continues is a separate offense.

**COUNT 3**
**VIOLATION OF BALTIMORE CITY CODE ARTICLE 2 § 4-2 PROHIBITING UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES**
**Collecting Debit Card Fees Prohibited by Payment Processors**
***RentCafe Defendants***

100. The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

101. Section 807 of the FDCPA makes it illegal to use "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including making any "false representation of" "the character, amount, or legal status of any debt" or "any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt," or using "any false representation or deceptive means to collect or attempt to collect any debt . . . ." 15 U.S.C. §§ 1692e(2), 1692e(10).

102. The RentCafe Defendants make such false representations and employ deceptive means in collecting and attempting to collect "service fees" in connection with debit card transactions. Payment processors overwhelmingly prohibit merchants from imposing surcharges for debit card transactions. As such, any "service fee" charged by the RentCafe Defendants is necessarily not passed along to the payment processor. But by calling them "service fees," the

RentCafe Defendants convey an impression that the fees are simply RentCafe passing along to consumers the fees that it is charged by payment processors when consumers use a debit card.

103. The aforementioned conduct violates the FDCPA and, because the RentCafe Defendants are corporations collecting debt on behalf of landlord and property managers, they violate the MCDCA by engaging in such conduct.

104. Furthermore, by violating the MCDCA, the RentCafe Defendants *per se* employ unfair, abusive, or deceptive practices in violation of the CPO.

105. Charging service fees not provided for in the lease is not only a *per se* violation of the CPO; it is also a deceptive trade practice. The RentCafe Defendants misrepresent to tenants that they are required to pay service fees for using a debit card when, in reality, these fees are prohibited by payment processors. This misrepresentation misleads reasonable consumers, who have no reason to question whether the fees being charged by the RentCafe Defendants are legal and often have no choice in the moment but to pay those fees, or risk falling behind on rent.

106. Each time the RentCafe Defendants collect or attempt to collect a fee that they have represented as a "service fee" in connection with a debit card transaction that is prohibited by the card processors' terms of service is a separate violation of the CPO. Each day upon which a violation continues is a separate offense.

**COUNT 4**
**VIOLATION OF BALTIMORE CITY CODE ARTICLE 2 § 4-2 PROHIBITING UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES**
**Collecting Rental Debts Without a License**
***RentCafe Defendants***

107. The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

108. The Maryland Collection Agency Licensing Act, Md. Code Ann., Bus. Reg. § 7-101 *et seq.* (MCALA), defines a collection agency as "a person who engages directly or indirectly in the business of . . . collecting for, or soliciting from another, a consumer claim," or "employing the services of an individual or business to solicit or sell a collection system to be used for collection of a consumer claim." *Id.* §§ 7-101(d)(1)(i), (d)(4). A consumer claim, in turn, is a claim that "is for money owed or said to be owed by a resident of the State; and arises from a transaction in which, for a family, household, or personal purpose, the resident sought or got credit, money, personal property, real property, or services." *Id.* § 7-101(e).

109. Rent payments are money owed by a tenant to their landlord or property manager for housing (*i.e.*, real property) and/or property management services.

110. As described above, the RentCafe Defendants collect rent payments and, after deducting their own fees, pass those payments on to landlords and property managers.

111. As described above, the RentCafe Defendants also sell a collection systems, *i.e.*, the RentCafe portal, to landlords and property managers to be used for the collection of rent.

112. According to the Nationwide Multistate Licensing System, the RentCafe Defendants do not have a collection agency license in Maryland.[21]

113. Operating as a collection agency without a license is a violation of MCALA, which, in turn, is a *per se* violation of the MCDCA, which in turn, is a *per se* unfair, deceptive, and/or abusive trade practice under the MCPA and a violation of the CPO.

114. Again, the RentCafe Defendants are on notice of this violation. The class of tenants who sued Yardi and YES Energy in Maryland in 2022 alleged that they were operating as

[21] Yardi Payments, LLC (NMLS ID# 1911824), NMLS Consumer Access, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/COMPANY/1911824 (last accessed Oct. 6, 2026).

a collection agency without a license, and the Court found at the motion to dismiss stage that the plaintiffs had plausibly alleged this theory. Yet several years later, the RentCafe Defendants continue to operate as an unlicensed collection agency in Maryland.

115. Each time the RentCafe Defendants collect rental debt without a license is a separate violation of the CPO. Each day upon which a violation continues is a separate offense.

**COUNT 5**
**VIOLATION OF BALTIMORE CITY CODE ARTICLE 2 § 4-2 PROHIBITING UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES**
**Failing to Disclose Service Fees**
***Pennrose***

116. The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

117. Pennrose accepts rent payments exclusively via RentCafe. Three of the four payment methods that Pennrose offers via RentCafe charge tenants an additional fee, and the only option that does not charge an additional fee is inaccessible to many Pennrose tenants, for reasons outlined above. As such, many Pennrose tenants are, actually or constructively, required to pay service fees in order to pay rent.

118. Failing to state a material fact if the failure deceives or tends to deceive is an unfair, abusive, or deceptive trade practice under the MCPA and CPO. Md. Code Ann., Com. Law § 13-301(3).

119. That some tenants will be required to pay service fees in order to pay rent is a material fact; without that information, tenants do not know the actual cost of their rent and cannot make an informed decision about whether to accept that term of the lease. By failing to disclose that tenants will be required to pay service fees in order to pay rent in their leases, the Property Management Defendants violate the CPO.

120. Furthermore, the rental price listed in the lease is not the total monthly amount that tenants will pay to rent a unit in a property managed by a Property Management Defendant, because the price in the lease does not include the compulsory service fees that tenants must pay. Misrepresenting the true cost of renting an apartment by failing to disclose compulsory service fees in a lease is a deceptive trade practice under the CPO.

121. Omitting compulsory service fees from the rent quoted in leases takes unreasonable advantage of an information imbalance between property manager and tenant and interferes with the tenant's ability to understand a significant term of their lease (*i.e.*, their total rent). As such, failing to include compulsory service fees in the lease is an abusive trade practice.

122. Each time Pennrose fails to disclose service fees which tenants may be required to pay in order to pay rent in a lease agreement is a separate violation of the CPO. Each day upon which a violation continues is a separate offense.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff the City of Baltimore respectfully requests that this Court enter judgment in its favor and against Defendants, as follows:

a. The maximum amount of statutory penalties under Baltimore City Code art. 2 § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code art. 2 § 4 ($1,000 per violation per day). Defendants have committed multiple violations each day, and those violations have continued for multiple days. The precise calculation shall be determined after discovery.

b. Injunctive relief prohibiting Defendants, their officers, agents, employees, and all persons acting in concert with them, from: (i) failing to disclose to consumers a full fee schedule prior to accepting any payment (All Defendants); (ii) steering consumers toward payment methods that require fees or away from payment methods that do not require fees (All Defendants); (iii) collecting or attempting to collect any rental payments, charges, or fees

associated with paying rent which exceed the amounts provided for in a consumer's lease (RentCafe Defendants); (iv) collecting or attempting to collect any rental payments, charges, or fees that RentCafe misrepresents as debit card "service fees" which are not permitted by payment processors (RentCafe Defendants); (v) collecting rental debts without a license to do so (RentCafe Defendants); (vi) failing to disclose to tenants and potential tenants if they will incur mandatory service fees in order to pay rent (Pennrose); and (vii) engaging in any substantially similar unfair, deceptive, or abusive acts or practices (All Defendants).

c. Any other relief as may be available or appropriate under the law or in equity, including but not limited to restitution and/or disgorgement.

**DEMAND FOR JURY TRIAL**

The City demands a jury trial for all claims so triable.

Date: October 19, 2026

/s/ Thomas Webb
Thomas Webb (Attorney ID: 1306190321)
Natalie Neill (Attorney ID: 2012180092)
Zachary Babo (Attorney ID: 2211280023)
Affirmative Litigation Division
BALTIMORE CITY LAW DEPARTMENT
100 N. Holliday Street, Suite 109
Baltimore, MD 21202
tom.webb@baltimorecity.gov
(410) 396-3947

Tara Ramchandani*
Yiyang Wu *
Ellora Thadaney-Israni*
Tinuola Dada*
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
tramchandani@relmanlaw.com
ywu@relmanlaw.com
eisrani@relmanlaw.com
tdada@relmanlaw.com
(202) 728-1288

* *Pro hac vice* forthcoming

*Attorneys for the Mayor and City Council of Baltimore*